PEOPLE *v.* BODJACK.

1. INTOXICATING LIQUORS—ILLEGAL POSSESSION—EVIDENCE—SUFFICIENCY.

In a prosecution for the possession of intoxicating liquors in violation of Act No. 338, Pub. Acts 1917, as amended, evidence *held*, sufficient to take the case to the jury.

2. CONSTITUTIONAL LAW — CRIMINAL LAW — STATUTES — EX POST
FACTO LAW—ENLARGING PENALTY.

> Act No. 3, Extra Session 1919, amending Act No. 53, Pub.
> Acts 1919, amending section 51 of Act No. 338, Pub. Acts
> 1917 (the penal clause), *held*, not open to the objection
> that, as to defendant, it is *ex post facto* within the mean-
> ing of section 9, article 2, Constitution of Michigan, hav-
> ing become operative after the commission of the alleged
> offense, since said penalty clause was not enlarged or
> increased thereby.

3. SAME — STATUTES — MANDATORY CONSTITUTIONAL PROVISIONS—
INTOXICATING LIQUORS.

> The contention of defendant that Act No. 53, Pub. Acts
> 1919, amending Act No. 338, Pub. Acts 1917, is uncon-
> stitutional in that it ignores the express mandate of
> section 11, Art. 16, Constitution of Michigan, *held*, de-
> cided adversely to defendant's contention in *People* v.
> *Urcavitch, ante,* 431.

4. SAME—STATUTES—TIME OF TAKING EFFECT—IMMEDIATE EFFECT
—LEGISLATIVE DISCRETION—ABUSE.

> In giving immediate effect to Act No. 53, Pub. Acts 1919,
> *held*, that the legislature did not abuse its discretion.
> *People* v. *Urcavitch, ante,* 431; *People* v. *Stambosva, ante,*
> 436.

Exceptions before judgment from Berrien; White
(Charles E.), J.   Submitted April 16, 1920.   (Docket
No. 115.)   Decided June 7, 1920.

Paul Bodjack was convicted of violating the liquor
law.   Affirmed.

*O'Hara & O'Hara,* for appellant.

*Alex. J. Groesbeck,* Attorney General, *J. E. Con-
verse* and *H. S. Sweeny,* Assistants Attorney General,
and *John J. Sterling,* Prosecuting Attorney, for the
people.

STONE, J.   This case is here upon exceptions before
sentence.   The defendant was informed against in the

circuit court for having in his possession in the county of Berrien, on the 2d day of May, 1919, certain intoxicating liquors, to wit: 12 bottles of whisky, in violation of Act No. 338, Pub. Acts 1917, as amended by Act No. 53, Pub. Acts 1919, as amended by Act No. 3, of the Extra Session of 1919. Upon the trial it was the claim of the people that the defendant had violated section 2 of the act.

The defendant was the proprietor of a restaurant and soft drink parlor in St. Joseph, Berrien county. Early in May, 1919, Everett Evans, a witness for the people, went to a saloon in Chicago and purchased over $100 worth of whisky, and it was claimed he sold a portion thereof to defendant. The attitude of this witness is rendered very apparent by a reading of his testimony. The following appeared upon the direct examination of this witness:

"*Q.* What was this stuff bought as in Chicago?
"*Mr. O'Hara:* I object to that as immaterial and irrelevant to this issue.
"*Q.* What did you buy?
"*Mr. O'Hara:* I object to that for the same reason.
"*The Court:* The question may be answered.
"*Mr. O'Hara:* Note an exception.
"*A.* I asked for whisky. I don't know what I got. I delivered 12 bottles to Mr. Bodjack in his soft drink parlor, and he gave me $84 for the same.
"*Q.* What did you tell him you were selling him?
"*Mr. O'Hara:* I object to that as immaterial.
"*A.* Whisky."

Earlier in this examination this witness testified as follows:

"*Q.* I will ask you if you sold Mr. Paul Bodjack, this respondent, any whisky last summer before your arrest?
"*Mr. O'Hara:* That is calling for the conclusion of this witness and I object to it. That is not the way to show what he sold to Paul Bodjack.
"*The Court:* The question may be answered.

"*Mr. O'Hara:* Note an exception.

"*A.* Not as I know of.

"*Q.* Not as you know of?

"*A.* Yes, sir.

"*Prosecuting Attorney:* Now, Everett, I have shown your intelligence, because you are an intelligent man.

"*Witness: A.* I am showing it right back, because I don't know what I sold him. I have testified before in this matter in justice court. I signed this testimony but I don't remember whether I read it over or not."

At this point the prosecuting attorney read from the testimony of this witness given upon the examination in justice's court, on the ground that counsel was taken by surprise in the testimony of the witness:

"*Q.* Listen to this (reading from the testimony taken on the examination):

" 'Do you remember being in there (in Bodjack's place) some time about the early part of last May?

" '*A.* Yes, sir.'

"Did you so testify?

"*A.* I don't remember.

"*The Court:* Mr. Witness, you remember that you are on the witness stand. You have taken an oath. This court is not to be trifled with, and you bear that in mind in giving your testimony, sir.

"*Q.* Do you want to leave that answer stand, or do you want to say you so testified?

"*A.* If I signed it, I did.

"*Q.* Did you testify that way?

"*A.* I don't remember whether I did or not.

"*Q.* Another question (reading from same examination):

" 'Did you have any business dealings with Mr. Bodjack about that time?

" '*A.* I did.'

"*A.* I did.

"*Q.* Did you have some business dealings with him about that time?

"*A.* I did.

"*Q.* Pay attention to this (reading from same examination):

   " 'What was it?
   " '*A.* Sold him 12 quarts of whisky.
   " '*Q.* Did you say whisky before?
   " '*A.* I did.
   " '*Q.* For how much money?
   " '*A.* Eighty-four.'

"Did you testify that way?
"*A.* I did.
"*Q.* Is that the truth?
"*Mr. O'Hara:* I object to it as calling for a conclusion.
"*The Court:* The question may be answered.
"*Mr. O'Hara:* Note an exception.
"*A.* I don't know.
"*Q.* Don't you know whether that is true or not?
"*A.* I don't know whether I sold him whisky or not.
"*Q.* Don't you know whether you got $84 for what you sold him?
"*A.* I did get it.
"*Q.* (Reading again from the testimony taken on the examination):

   " 'Did you get the money for this whisky?
   " '*A.* I did.'

"Did you so testify?
"*A.* Yes, sir.
"*Q.* 'In cash?' '*A.* Yes. sir.' Did you so testify?
"*A.* I did.
"*Q.* Is that the truth?
"*A.* Yes, sir. * * *
"*Prosecuting Attorney:* Where had you obtained this whisky, Mr. Evans, that you sold Mr. Bodjack?
"*Mr. O'Hara:* Just a minute. I object to it as there is no testimony that he sold any whisky to Mr. Bodjack.
"*The Court:* I think, in view of the testimony of the witness as to the conversation that he had with the respondent, I will permit the answer.
"*Mr. O'Hara:* Note an exception.
"*A.* Chicago.
"*Q.* Who from over in Chicago?

"*A.* Why it was a saloon on 35th and State streets.
* * *

"*Q.* How much whisky did you buy there at that time?

"*Mr. O'Hara:* The same objection, and the further objection, it is immaterial how much whisky he bought in Chicago, if any.

"*The Court:* Same ruling.

"*Mr. O'Hara:* Note an exception.

"*A.* I don't remember how much I purchased at that time, but it was more than 12 quarts.

"*Q.* How many quarts did you buy on that occasion, or about, if you know?

"*Mr. O'Hara:* Same objection.

"*The Court:* Same ruling.

"*Mr. O'Hara:* Note an exception.

"*A.* I don't remember, I bought over $100 worth I reckon."

On his redirect-examination the following occurred:

"*Q.* Did Bodjack ever come back to you at any time and ask you for his money back because this was not whisky?

"*Mr. O'Hara:* I object to it as immaterial.

"*The Court:* It may be answered.

"*Mr. O'Hara:* Note an exception.

"*A.* No, sir."

This witness also testified as follows:

"There was no one else present when I got the money from Mr. Bodjack. I met him on the street and asked him if he wanted to buy some whisky, telling him that I had 12 quarts and that I would sell it to him for $7 a quart. He said he would take it. I was to deliver it at his place of business, which is a soft drink parlor and restaurant located in St. Joseph, Michigan."

The defendant was not sworn as a witness in the case. The question submitted to the jury was whether or not the defendant had whisky in his possession at the time and place charged. The defendant claimed at the trial, as he claims here, that there was no testi-

mony produced that tended, in any way, to prove that he ever possessed any whisky contrary to law. This question was first raised on the trial in a motion to direct a verdict, which was denied. The case was submitted to the jury and the defendant was found guilty.

1. By appropriate assignments of error it is claimed by defendant's counsel that there was no substantive testimony in the case that Evans ever sold to defendant any whisky, or that the latter ever possessed any whisky. We cannot agree with counsel in this contention. We think there was some substantive testimony tending to show the guilt of the defendant. The extract from the testimony above given shows that the witness Evans testified that he told the truth when he testified on the examination that he got the money from defendant for this whisky. There are numerous instances in the course of his testimony where it appears thereby that he sold and delivered 12 bottles to the defendant in his soft drink parlor and received $84 for the same, and that the defendant had never asked him to return any money because this was not whisky. We think this evidence was sufficient to take the case to the jury, and that the verdict of the jury should not be disturbed upon the ground that there was no evidence tending to show the guilt of the defendant.

2. The next question raised and discussed by counsel for the defendant, and urged here as it was in the court below, is that the law is *ex post facto,* and attention is called to Act No. 3 of the Extra Session of 1919, amending section 51, or the penal clause. This act took immediate effect and became operative on June 25, 1919. We quote the following from defendant's brief:

"The people claim that respondent committed this crime on or about May 2, 1919, and the evidence de-

velops that the transaction Evans claims to have had with respondent occurred in May, 1919. There is no claim or proof that respondent violated this law subsequent to May, 1919.

"Respondent contends that as to him and this case, this law, as amended by Act No. 3 aforesaid, is *ex post facto* within the meaning of section 9, article 2, of the Constitution of this State, which provides:

" 'No bill of attainder, *ex post facto* law, or law impairing the obligation of contracts shall be passed.'

"An amendment to a statute defining a crime, which does not contain a saving clause, and which enlarges the penalty for the commission of the crime is an *ex post facto* law within the meaning of section 9 of article 2 of the Constitution aforesaid, when applied to violations of the statute committed prior to the passage of the amendment. 12 Corpus Juris, pp. 1097, 1100, 1101; *In re Lambrecht*, 137 Mich. 450; 6 R. C. L. p. 299.

"The violation alleged in this case, if it happened at all, was committed several weeks prior to the passage of said act No. 3. This act contained no saving clause; hence, if the said act enlarged the penalty for the violation of Act No. 338, Pub. Acts 1917, as amended, it is an *ex post facto* law in so far as this particular case is concerned, and the prosecution should have been dismissed."

Defendant's counsel insist that the penalty was enlarged by this last amendment. Prior to June 25, 1919, section 51 read as follows, as amended by Act No. 53:

"Any person, who, himself, or by his clerk, agent or employee, shall violate any of the provisions of this act, for which violation a specific penalty is not herein provided, shall be guilty of a felony and upon conviction thereof be sentenced to pay a fine of not more than one thousand dollars and the cost of prosecution, or to imprisonment in any penal institution of this State for a period of not more than one year, or both such fine and imprisonment in the discretion of the court, and for every second and subsequent offense, so committed, whether in the same county or

in any other county of the State, he shall, upon conviction thereof, be sentenced to imprisonment in any penal institution of this State for a term of not less than six months or more than two years, and in addition thereto the court may impose a fine not to exceed one thousand dollars."

Said section in said Act No. 3 now reads as follows:

"Any person, who, himself, or by his clerk, agent or employee, shall violate any of the provisions of this act, for which violation a specific penalty is not herein provided, shall be deemed guilty of a felony, and upon conviction thereof be sentenced to pay a fine of not more than one thousand dollars and the costs of prosecution, or to imprisonment in the State prison, Michigan Reformatory, or the Detroit House of Correction for a period of not less than six months nor more than one year, or by imprisonment in the county jail for not less than thirty days, nor more than one year, or by both fine and imprisonment in the discretion of the court, and for every second and subsequent offense, so committed, whether in the same county or in any other county of the State, he shall upon conviction thereof, be sentenced to imprisonment in any penal institution of this State for a term of not less than six months nor more than two years, and in addition thereto the court may impose a fine not to exceed one thousand dollars."

Counsel concedes that the answer to this question depends upon the construction to be placed by this court upon the words "any penal institution of this State," as used in said section prior to this last amendment with reference to punishment for the first offense; and it is urged that the above phrase, as used in Act No. 53, included not only the prisons, reformatory and house of correction in this State, but also all county jails. In reply to this claim of defendant's counsel the attorney general, in his brief, says:

"Had these words read 'any penal institution in this State,' there might be some force and effect to the contention made by respondent. The most com-

monly accepted and known definitions of the preposition 'of' are: 'belonging to' and 'denoting possession or ownership.' It must be presumed that this word was used by the legislature in its common and approved usage, and we think it is clear that by using the words 'any penal institution *of* this State' it was meant those penal institutions belonging to and owned by the State as distinguished from all penal institutions which might belong to the particular municipalities or counties in this State.

"Practically the same question was addressed to the court in *Bronk* v. *Riley*, 2 N. Y. Supp. 266, in which it was held that:

" 'Laws N. Y. 1888, chap. 586, prohibiting the use of motive-power machinery, for manufacturing purposes, "in any of the penal institutions of the State," and the employment of the convicts therein at certain labor, applies only to the State prisons and such other prisons and reformatories as are constructed by the State, and at its expense.

" 'A penitentiary erected by a county, the management of which is vested in local and county officers, the money belonging to which is required to be deposited in the county treasury, and subject to the control of the board of county supervisors, is not a State institution, although prisoners from other counties may be confined in it under contract between the county or penitentiary officers and the State or the county sending such prisoners.'

"Under the provisions of the law prior to the amendment, made by Act No. 3 of the Public Acts of the Extra Session of 1919, the minimum term of imprisonment not being fixed by the act, any imprisonment imposed by the court for the first offense had to be under the provisions of sections 15859 and 15860 of the Compiled Laws of 1915 for a minimum term of six months. The maximum imprisonment was fixed by the act itself at not more than one year.

"It is significant of the fact that the legislature used and so understood the meaning of the phrase, 'any penal institution of this State,' as not including any other than those belonging to the State when it designated, in Act No. 3 aforesaid, the Detroit House of Correction as a penal institution in which imprisonment can now be made. To accomplish this end, the words 'State Prison, Michigan Reformatory or the De-

troit House of Correction' were substituted for the words 'any penal institution of this State.'

"The real effect of Act No. 3 of the Public Acts of the Extra Session of 1919 is to decrease the penalty by permitting imprisonment in the county jail for not less than thirty days nor more than one year upon the first offense of a violation of the provisions of the prohibitory act. The minimum term of imprisonment of six months in the said penal institutions theretofore provided is by this act now reduced, in the discretion of the trial judge, to imprisonment to a term of thirty days in a county jail."

After as thorough an examination as we have been able to give this question, we think the position of the attorney general is the correct one, that the penalty clause of Act No. 53 was not enlarged or increased by Act No. 3, Extra Session 1919, and that there is no merit in the question urged by defendant's counsel upon this subject.

3. It is next urged by counsel for defendant that the statute here involved, as amended, which we have above cited, and under which this prosecution was instituted, is unconstitutional in that it ignores the express mandate of section 11, article 16, of the Constitution, which reads as follows:

"* * * The legislature shall by law provide regulations for the sale of such liquors for medicinal, mechanical, chemical, scientific and sacramental purposes";

—and assumes the power to prohibit and prevent a lawful sale of intoxicating liquors for the five excepted purposes, the act not complying with the requirements of the Constitution, and also by absolutely prohibiting the possessing of such liquors for any purpose, it renders wholly nugatory and ineffective the provisions of the act prohibiting the sale for the purposes named therein.

This position or claim has been so thoroughly and

clearly answered by Justice BIRD in the case of *People*
v. *Urcavitch, ante,* 431, handed down herewith, that
we shall not repeat the argument here, but refer to
that case as holding adversely to the claim of the de-
fendant. That opinion clearly rules this question.

4. It is next urged that Act No. 53 of the Public
Acts of 1919 should not have been given immediate
effect, and that the same should not, and could not
have been in force until 90 days after the end of the
session at which the said act was passed. This ques-
tion has also been so thoroughly covered in the opinion
of Justice BIRD, above referred to, and also by Justice
STEERE in the case of *People* v. *Stambosva, ante,* 436,
handed down herewith, that we shall spend no time
upon the subject, but shall hold that, for the reasons
stated in those opinions, there is no merit in the ques-
tion, and we hold adversely to the contention of the
defendant in that regard for the reasons already re-
ferred to.

We have examined, but shall not spend any time
in discussing, the questions raised by the other assign-
ments of error. We find no reversible error in the
record. The conviction of the defendant is affirmed,
and the court below will proceed to judgment accord-
ingly.

MOORE, C. J., and STEERE, BROOKE, FELLOWS, and
BIRD, JJ., concurred. CLARK and SHARPE, JJ., did not
sit.